38449. SOUTHERN RAILWAY COMPANY v. DANIELL.

DECIDED SEPTEMBER 22, 1960.

*Claude Driver, Matthews, Maddox, Walton & Smith, John W. Maddox,* for plaintiff in error.

*E. B. Jones, Jr., Thomas B. Murphy, Murphy & Murphy,* contra.

TOWNSEND, Judge. ■ It is the contention of the defendant that it is entitled to judgment notwithstanding the verdict

because the evidence demands a finding that the plaintiff's injuries proximately resulted from his own lack of ordinary care for his safety. The evidence shows that the train crew had been engaged in switching operations and that the engine, which had been disconnected from the cars, had been motionless for a few minutes prior to the collision; that its motor was running, which the plaintiff knew when he entered his automobile because he heard it; that when the plaintiff turned his automobile around and headed south to the crossing the engine was not moving, and the train crew, under their own testimony, were looking back down the track waiting for a hand signal to commence switching; that at that moment, which was the last time the plaintiff looked directly at the engine, it was about 40 feet west of the intersection and the plaintiff was the same distance north of the intersection; the time was the middle of the afternoon and there was no obstruction to block the view of either party. The plaintiff then drove slowly onto the crossing; as he came upon it he suddenly became aware of the increased noise of the train engine and looked up to find it within four feet from him; he jammed his brakes almost at the same instant the engineer on the train pulled its emergency brakes, and a collision followed which pushed the automobile about five feet sidewise down the track. Neither the automobile nor the engine was moving at more than five miles per hour at the time. The evidence was disputed as to whether the defendant's employees had signaled by whistle and by ringing the bell. There was no other signal given that the train was in motion, and, as to this, the engineer testified concerning the conductor: "I am sure he was on the crossing, he was supposed to have been flagging," but other evidence showed the conductor was in fact standing west of the engine and not at the crossing. The evidence construed in favor of the verdict thus authorized the inference that the engine of the train had been standing motionless for some few minutes just beyond the intersection crossing, which was known to the crew to be an extremely busy one; that a flagman should have been on duty but was not, and that the engineer and fireman, charged with knowledge of the situation, put the engine in motion and drove it out into the

crossing without looking in the direction in which they were moving, but with their heads turned in the opposite direction, so that not only could they not see the crossing but they gave the impression to any person looking at them that they intended to move, if at all, away from the crossing. The only question for decision is whether under these circumstances it should be held as a matter of law, either that the negligence of the plaintiff was equal to or greater than that of the defendant, or that the plaintiff failed to exercise ordinary care to avoid the negligence of the defendant after it should have been known to him. Ordinary negligence on the part of the plaintiff, unless it falls in one of these categories, will not bar recovery. *Willis v. Jones,* 89 Ga. App. 824 (81 S. E. 2d 517); *Conner v. Downs,* 94 Ga. App. 482 (95 S. E. 2d 393). In *Smith v. American Oil Co.,* 77 Ga. App. 463, 491 (49 S. E. 2d 90), nine rules are summarized relating to contributory and comparative negligence in this State, the last reiterating the rule: "It is generally a question for a fact-finding body to determine questions of negligence and whose negligence and what negligence involved is the sole proximate cause of the injury. It is only where negligent conduct alleged is susceptible of but one inference that it becomes a question of law for the court to determine." There is no doubt but that in the present action both the plaintiff and the defendant were negligent, and there is no doubt but that, had either discovered the negligence of the other in time, this collision would not have occurred. There is no doubt that the plaintiff did not in fact discover the defendant's negligence until it was too late for him to extricate himself. As against the contention of the plaintiff in error that this court should hold, as a matter of law, that such failure to discover the defendant's negligence was in fact a lack of ordinary care on the plaintiff's part so as to preclude his recovery, counsel for the plaintiff argues these evidentiary facts: the plaintiff looked at the engine twice, once while the car was parked, and again after he turned it around, and it was standing still; there was no indication that the engineer intended to move toward the crossing but as a matter of fact he and the fireman were both looking back at the switching operation, from which it was to be assumed

that the engine, if it moved at all, would move in the opposite direction; the plaintiff had a right to expect that under these circumstances if the engineer intended to pull ahead he would give some signal of that intention, which he did not do, and this was especially true where it was obvious to the engineer that the automobile was moving toward the track and only two or three car lengths from it, whereas at the time the plaintiff started his car in motion in this manner he did look at the engine and the engine was not moving, the two vehicles being approximately the same distance from the track. Under these circumstances, we feel that the issue as to right of recovery, as well as amount of recovery, is a question of fact for the jury rather than a question of law for this court to decide. The motion for judgment notwithstanding the verdict and the motion for a new trial on the general grounds were properly denied by the trial court.

■ The instructions on loss of earning capacity are the subject of the exceptions in special grounds 5, 6, 7, 8, and 11, the charge given being as follows:

*"He also contends that he lost certain earnings as a result of these injuries which he says were directly and proximately caused by the negligence of the defendant. He alleges that there is a decrease in his earning capacity by reason of the alleged injury, that his earning capacity has been decreased or destroyed. I charge you, you look to what his occupation was and what his earning capacity was at that time. He says that by reason of the alleged injuries he is unable to perform the duties of his occupation as a result of his alleged injuries, and asks that the reduction of his earning capacity be allowed as damages. . . You determine whether that is true or not, and if so, you should find that amount for him in such verdict as you might render in the case. . . I charge you that the mortality tables are applicable to this case, as stipulated by the parties. You may apply that in determining any damages which you might allow to this plaintiff in the future for earning capacity, or you may use any other method that you know, if you find that he is entitled to for loss of earning capacity, to decrease that. . .*

"With reference to earning capacity, I give you this rule. If you find that his earning capacity has been decreased under the rules which I have given you, and that he is entitled to compensation for that decrease in earning capacity, you would apply this rule: You must reduce the amount of any future loss of earning capacity to its present cash value, at the rate of seven percent per annum. You would not apply that rule to any other item of damage which you may allow if you allow anything, but you would, for future earning capacity, apply that rule to any amount which you allow to the plaintiff for future loss of earning capacity."

The stipulation to which the trial court refers reads as follows: "The Carlisle Mortality Table for age 60 shows the life expectancy to be 14.34 years." The objections to the instructions as given are that the stipulation was erroneously stated so as to mislead the jury; that the jury was not informed they might award damages for loss of earning capacity only if the injuries were permanent in nature; that there was no evidence before the jury from which an inference that the injuries were in fact permanent would be authorized; that there was no proper evidence upon which a future loss of earnings could be based because the evidence fails to show what pecuniary loss the plaintiff has sustained and also fails to show the value of his work and labor prior to the injury; that there is in the evidence no data upon which a diminution of earning capacity can be based, and that, when the court did charge on loss of earning capacity, he totally failed to instruct the jury to take into consideration such diminution in the plaintiff's earning capacity as might be caused by declining years and pre-existing disease.

The plaintiff's testimony on this subject was as follows: "Prior to this collision I was able to work and earn a livelihood doing carpenter work by myself. My average earnings per week were from $75 to $100. I worked on my own buildings. Since this wreck I have not been able to do that. I have had to hire my labor done. . . As to whether I had some sort of arrangement where I paid myself a salary or social security, they won't allow you to pay it on rental property, you just have to estimate

your income. My estimation of that income was from $75 to $100 a week from the rental of that property and myself too, what I worked. The $75 to $100 a week that I referred to includes the rental that I get off of the property that I own. As to how much of the $75 to $100 a week was rental of property that I own, well, it is owing to how many you have got rented, some of them are empty. I have got 13 apartments. As to whether sometimes, when my property is empty, my earnings are less than $75 to $100 a week, I say I don't work at that all the time. I do a lot of building for myself elsewhere. That $75 to $100 a week includes both that and the rental. I estimated some value for my services. Prior to this collision when I was injured, I worked for other people and myself. I maintained all my rental property. Since this accident, I have not been able to maintain my rental property myself. I have had to hire somebody to do it. As to whether or not my rental income has been affected any way other than by having to hire somebody to maintain it, I have been keeping them up myself, and since I have been hurt I have had to hire all my labor done. Since this collision I have not been able to do any work at all. I have been in constant pain since this collision. . . I have had considerable constant pain since that time. It is my neck and right shoulder and arm that hurt me now, and my nerves is all shot to pieces. When I am driving I can't turn my head and look back."

As to the plaintiff's injuries, his doctor testified that beginning June 27, 1959, after the injury on April 28, he treated the plaintiff for about three months; that he suffered hypersthenia or acute sensitivity to stimulus in the right arm; that deep tendon reflexes indicate some nerve root damage resulting from pressure; that there were previous arthritic changes which the trauma in his opinion undoubtedly aggravated; that there was a certain amount of injury to the muscles in the neck which could cause scar tissue and account for the muscle spasm; that all of these factors would cause pain. He further stated: "Most people that sustain an injury of this nature are unable to do any sort of work until the acuteness of the injury has subsided. In an older individual (the plaintiff was in his 60's) the conva-

lescence is a lot longer than it would be in younger people. . . As of the last time I saw him (July 10, 1959) I do not think he could have done any of his usual type of work. In the first place, this was the right arm and shoulder that was involved . . . I don't see how he could have done it, and this was two or three months after the accident. He still had spasm in the neck trapezius muscle on July 10, although he did say that it felt better." The plaintiff's head and neck motion was still restricted at the time of trial in January, 1960.

(a) From the doctor's testimony as to nerve root damage, which is usually permanent in nature, plus the plaintiff's testimony as to his continuing disability some ten months after the initial injury, there is evidence which would at least authorize the inference that the injuries would extend into the future, and accordingly the assignment of error based on the proposition that there was no evidence which would authorize a charge on permanent injury is without merit. On the other hand, there was no evidence which would demand a finding that the plaintiff's injuries and loss of earning capacity were necessarily permanent. Where the evidence on the trial of a personal injury case presents an issue as to whether or not the injuries are permanent in character, it is error for the court to charge on the mortality and annuity tables without also instructing the jury that the table can be used only in case the injuries are shown to be permanent, and that if they are not permanent they will have no use for the table. *Powell v. Jarrell,* 65 Ga. App. 453, 467 (11) (16 S. E. 2d 198); *Seaboard Air-Line Ry. v. Brewton,* 150 Ga. 37 (2) (102 S. E. 439); *W. & A. R. Co. v. Knight,* 142 Ga. 801 (83 S. E. 943); *W. & A. R. Co. v. Smith,* 145 Ga. 276 (6) (88 S. E. 983); *Davison-Paxon Co. v. Archer,* 91 Ga. App. 131 (85 S. E. 2d 182). The court's charge in relation to the mortality table contained a double error. He failed to charge that the table became relevant only if the injuries were of a permanent character. He went further and stated: "I charge you that the mortality tables are applicable to this case, as stipulated by the parties," whereas the parties had not stipulated that the mortality tables were applicable to the case, but only that they showed a given life expectancy for a person of the plaintiff's age.

(b) As was pointed out in *Jones v. Hutchins,* 101 Ga. App. 141 (113 S. E. 2d 475) decided cases have given rise to confusion because of contradictory distinctions between "loss of capacity to labor and earn money," "loss of earning capacity," and "loss of future earnings." It is there stated (p. 149): "Based on evidence of what the plaintiff was able to do before and after the injury, the nature and percentage of permanent impairment, and the value of the services before the injury, a jury may make an award as compensation for diminished earning capacity, whether or not the evidence establishes with any exactitude the lost future earnings. Insofar as in doing so it considers any amount of money as lost future earnings in reaching its conclusions as to just compensation, that amount must be reduced to present cash value." But there must always be some evidence that will furnish the jury a basis for reasonable estimation of loss or diminution of capacity to earn money. *Rogers v. Wilson,* 100 Ga. App. 301, 305 (111 S. E. 2d 251), and citations. The evidence in this case fails to meet these requirements. There is no way of ascertaining what the plaintiff earned from his labor prior to his injury, because he made no attempt to distinguish between rental income and income from his labor as a carpenter on his own or other buildings. There is no way of telling what financial impairment he suffered after his injury because, while he testified that the labor of maintaining his premises which he had previously done himself he now had to hire others to do, he did not indicate what amount of work this constituted or how much he had to pay for it. Although he testified that at the time of the trial he was unable to do any work because of pain, and the doctor testified that convalescence would be slow, there was no attempt to arrive either at a percentage or time-limitation factor on the disability. The charge was accordingly not adjusted to the evidence in the case.

(c)  Insofar as the charge as given referred to loss of future monetary return reduced to present cash value, it should have included an instruction that the capacity to earn money is frequently diminished by ill health and declining years. *Atlantic Coast Line R. Co. v. Thomas,* 83 Ga. App. 477(7) (64 S. E. 2d 301).

For all of these reasons, the excerpts from the charge complained of in special grounds 5, 6, 7, 8, and 11 of the amended motion for a new trial constitute reversible error.

■ The remaining special grounds are either without merit or are such as are unlikely to recur upon another trial of the case.

The trial court erred in overruling the motion for a new trial as amended.

*Judgment reversed. Carlisle and Frankum, JJ., concur. Gardner, P. J., not participating.*